UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

GREGORY FERGUSON,

Docket No.:   7:26-cv-2224

Plaintiff,

-against-

**COMPLAINT**

HEALTHCARE SERVICES GROUP, INC.,
EPOCH SENIOR LIVING, LLC,
And RUBEN VIDAL, *individually,*

***Jury Trial Demanded***

Defendants.

-------------------------------------------------------X

Plaintiff GREGORY FERGUSON, by and through his attorneys, the BELL LAW GROUP PLLC, respectfully alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. This action arises from Defendants' unlawful discrimination, harassment, and retaliation against Plaintiff, an African American man, after he reported workplace safety violations, filed a workers' compensation claim following an on-the-job injury, and complained of race-based harassment by his supervisor. After Plaintiff reported an OSHA violation arising from being ordered to perform work far exceeding his job's safety limitations, Defendants altered his work hours and job duties, subjected him to harassment, and ignored his complaints of racial animus, including his supervisor's use of a racial slur.

2. Defendants ultimately terminated Plaintiff under the pretext of "insubordination," despite the absence of any legitimate basis, in retaliation for Plaintiff's protected activity and because of his race and disability, in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law ("NYSHRL"), and New York Workers' Compensation Law.

## JURISDICTION AND VENUE

3.    This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§1331 & 1343.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

4.    Venue is proper in this case pursuant to 28 U.S.C. §1391 because (1) the Defendants are located in Westchester County, New York, which is located in the Southern District of New York, and (2) the events which give rise to the Plaintiff's claims took place in Westchester County, New York, which is located in the Southern District of New York.

## PARTIES

5.    Plaintiff GREGORY FERGUSON ("Mr. Ferguson") is a resident and domiciliary of Westchester County. At all times relevant to the Complaint, Mr. Ferguson was an "employee" of Defendants HEALTHCARE SERVICES GROUP, INC. (hereinafter, "HCSG Defendant") and EPOCH SENIOR LIVING, LLC (hereinafter, "Epoch Defendant") as that term is defined by Title VII, the ADA, New York's Worker's Compensation Law, and New York State Executive Law §§ 290 et seq.

6.    Defendant HEALTHCARE SERVICES GROUP, INC. ("Defendant HCSG") was and still is a foreign business corporation incorporated under and by virtue of the laws of the State of Pennsylvania.  Its principal place of business is located at 3220 Tillman Drive, Suite 300, Bensalem, PA 19020.  At all times relevant to the Complaint, HCSG Defendant was Mr. Ferguson's "employer," as that term is defined by Title VII, the ADA, New York's Worker's Compensation

2

Law, and New York State Executive Law §§ 290 et seq. At all relevant times, HCSG employed more than 15 employees.

7. Defendant HCSG is a contract housekeeping and facilities management company that entered into a service agreement with Defendant Epoch pursuant to which HCSG supplied housekeeping personnel, including Plaintiff, to work at Epoch's senior living facility located in Westchester County, New York (the "Facility").

8. Defendant HCSG retained formal authority over hiring, firing, and formal discipline of housekeeping employees including Plaintiff, and employed Defendant Vidal as Plaintiff's direct supervisor.

9. Defendant EPOCH SENIOR LIVING, LLC ("Defendant Epoch") was and still is a foreign business corporation incorporated under and by virtue of the laws of the State of Delaware. Its principal place of business is located at 51 Sawyer Rd., Suite 500, Waltham, MA 02453. At all times relevant to the Complaint, Epoch Defendant was Mr. Ferguson's "employer," as that term is defined by Title VII, the ADA, New York's Worker's Compensation Law, and New York State Executive Law §§ 290 et seq. At all relevant times, Epoch employed more than 15 employees.

10. At all times relevant herein, Defendant Epoch owned, operated, and controlled the Facility at which Plaintiff performed his work.

11. Defendant Epoch exercised control over the physical conditions, layout, and operations of the Facility, including the areas in which Plaintiff performed his duties, the equipment available to him, and the schedule under which residents of the Facility conducted their daily activities, including the breakfast schedule that directly governed when Plaintiff could and could not perform his primary job function of shampooing carpets.

12.     Defendant Epoch had the authority to set and enforce policies governing conduct at the Facility, including workplace safety policies, anti-harassment policies, and policies governing the physical demands that could be placed on workers performing services at the Facility.

13.     Defendant Epoch's management personnel were present at the Facility and had actual knowledge of the working conditions, supervisory conduct, and complaints made by Plaintiff, including Plaintiff's complaints regarding OSHA violations, disability-related harassment, and racial discrimination.

14.     Notwithstanding HCSG's formal employment relationship with Plaintiff, Defendant Epoch exercised sufficient control over the day-to-day terms and conditions of Plaintiff's employment to constitute a joint employer, including but not limited to:

(a) controlling the physical premises, equipment, and operational conditions under which Plaintiff performed his work;

(b) controlling the schedule of Facility residents, which in turn directly controlled when and whether Plaintiff could perform his primary job functions;

(c) retaining authority to approve, reject, or modify the work assignments given to housekeeping personnel performing services at the Facility;

(d) setting and enforcing safety standards and physical requirements applicable to workers performing services at the Facility, including weight-bearing limitations on solo lifting;

(e) receiving and responding — or failing to respond — to complaints made by Plaintiff regarding workplace safety violations, harassment, and discrimination occurring at the Facility;

4

(f) having authority to direct HCSG to remove, reassign, or replace personnel performing services at the Facility; and

(g) retaining the right to require that personnel performing services at the Facility comply with Epoch's own workplace policies and standards of conduct.

15. Defendant RUBEN VIDAL ("Mr. Vidal") was, at all relevant times herein, Mr. Ferguson's direct supervisor, was Plaintiff's "employer" as he had authority over the terms, conditions, or privileges of his employment, as well as the authority to hire, fire, and discipline employees.

16. At all times relevant herein, Defendants HCSG and Epoch shared or co-determined the essential terms and conditions of Plaintiff's employment, including his job duties, work schedule, physical work requirements, and ultimately the decision to suspend and terminate his employment.

17. By reason of the foregoing, Defendants HCSG and Epoch were Plaintiff's joint employers within the meaning of applicable law, and each is jointly and severally liable for the unlawful conduct alleged herein.

**ADMINISTRATIVE PROCEDURES**

18. On June 18, 2025, Plaintiff filed a timely charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") bearing EEOC Charge No. 520-2025-06542.

19. On December 19, 2025, the EEOC issued Mr. Ferguson a Notice of Right to Sue. Annexed hereto, and hereby incorporated into this Complaint, as Exhibit A, is a copy of Plaintiff's Charge of Discrimination and Notice of Right to Sue.

20. Mr. Ferguson has complied with any and all other prerequisites to filing this action.

5

**FACTUAL ALLEGATIONS**

21.     In or around August 2023, Mr. Ferguson was hired by Defendants as a Floor Technician.

22.     Mr. Ferguson's job duties included cleaning carpets, shampooing rugs, cleaning linoleum floors, and when needed, emptying the trash.

23.     Mr. Ferguson performed his duties satisfactorily and had no disciplinary history prior to his termination.

24.     On or around October 25, 2024, Mr. Ferguson's manager, Mr. Vidal, asked him to move a marble table weighing over 100 pounds without assistance.

25.     Mr. Ferguson's job description limited solo lifting to items under 50 pounds and historically, at least two people were assigned to move such tables.

26.     Mr. Ferguson objected to moving the table alone, but Mr. Vidal insisted that the table needed to be moved, and this task was Mr. Ferguson's responsibility.

27.     Mr. Ferguson then attempted to move the table, strained his back, and was taken to the hospital where he was diagnosed with a back spasm, prescribed medication, and instructed to refrain from lifting or performing strenuous activity upon returning to work. Mr. Ferguson's doctor recommended that he not return to work until November 9, 2024.

28.     Mr. Ferguson suffered from a slipped disc in his back after lifting the heavy furniture.

29.     This slipped disc substantially impairs his major life activities, such as walking, exercising, lifting laundry baskets and other items, getting dressed, driving, traveling and sitting for longer 20 minutes in one position.

30.     Mr. Ferguson has experienced these impairments since October 25, 2024, when he was asked to move the marble table.

31.     Mr. Ferguson saw a chiropractor for his slipped disc and back pain and received a cortisone shot in his back to treat the pain.

32.     On or around October 28, 2024, Mr. Ferguson filed an incident report citing the OSHA violation that led to his injury. In this complaint, Mr. Ferguson explained that Mr. Vidal demanded that he move a table over the OSHA weight limit without assistance. To Mr. Ferguson's knowledge, Defendants never took any action regarding his complaint.

33.     On or around that same date, Mr. Ferguson also filed a claim for workers' compensation.

34.     The Defendants were aware of Mr. Ferguson's disability based on his disclosure of his back condition and his workers' compensation claim.

35.     On or around November 17, 2024, Mr. Ferguson received a text from Mr. Vidal explaining that upon his return from leave, his schedule had been altered from 6:00 a.m. to 2:00 p.m. to 7:00 a.m. to 3:00 p.m.

36.     This hour-change impeded Mr. Ferguson's ability to perform essential job functions. On a normal day, Mr. Ferguson would shampoo the carpets at 6:00 a.m. before the residents left their rooms for breakfast at 7:00 a.m. With this new schedule, Mr. Ferguson was unable to shampoo the carpets because for his entire shift, the residents were out of their rooms on the carpet.

37.     Upon Mr. Ferguson's first day back at work, Mr. Vidal also told him that his new responsibilities included vacuuming and cleaning windows, which required Mr. Ferguson to climb a ladder to reach the higher windows.

38.     Mr. Ferguson was concerned, given his recent injury, and asked Mr. Vidal why his job responsibilities had changed. Mr. Vidal told Mr. Ferguson that he would have to speak to the regional director for that answer.

39.     On or about November 18, 2024, Mr. Vidal yelled at Mr. Ferguson, stating that "you will do whatever I tell you to do."

40.     Mr. Ferguson also heard Mr. Vidal refer to him as a "fuckin' moreno" in a conversation with a coworker in Spanish. When taken in the context of Mr. Vidal's frustration, Mr. Ferguson reasonably understood "moreno" to have a derogatory meaning as a racial slur, rather than a statement of skin color.

41.     That same day on November 18, 2024, Mr. Ferguson lodged a formal complaint against Mr. Vidal regarding both the October 25, 2024 incident and the November 18, 2024 incident of Mr. Vidal requiring plaintiff to perform work that he was not supposed to do as a result of his recent injury and disability.

42.     Mr. Ferguson's November 18, 2024 complaint alleged that he was being harassed and discriminated against due to his back injury, which the Defendants clearly perceived to be a disability.

43.     Mr. Ferguson filed the complaint verbally on the Defendants' HR line, therefore he is not in possession of the exact words he used in his complaint.

44.     Mr. Ferguson does recall stating that he believed he was being harassed and treated differently due to his back injury. Mr. Ferguson stated after he came back from work after his injury, his hours and job duties were changed.

45. Further, Mr. Ferguson reported that Mr. Vidal started to curse and yell at him when he told him that he could not do certain jobs because of his back injury, such as climbing a ladder to clean windows.

46. On or around December 3, 2024, Mr. Vidal requested to have a conversation with Mr. Ferguson about his work. During this conversation, Mr. Vidal again screamed at Mr. Ferguson, stating, "I told you to clean the fuckin' windows."

47. Mr. Ferguson explained that he would take care of the trash first as it had piled up and he would then move onto the windows.

48. Mr. Vidal stood up and loomed over Mr. Ferguson, who was seated, and then yelled, "I don't give a fuck about the trash, I told you to do the fuckin' windows. I'm tired of you."

49. Because Mr. Ferguson reasonably believed that his job was in jeopardy, he reached out to Regional Director Anthony Greco ("Mr. Greco"), to inform him of Mr. Vidal's behavior.

50. To Mr. Ferguson's knowledge, Mr. Greco never investigated or followed up on Mr. Ferguson's complaint against Mr. Vidal.

51. On or around December 4, 2024, Mr. Ferguson clocked into work as normal, but an hour later Mr. Vidal told Mr. Ferguson that he needed to clock out until further notice.

52. Mr. Ferguson informed Mr. Greco that he had been terminated and in response, Chris Ricci ("Mr. Ricci"), a human resources professional, called Mr. Ferguson and informed him that he was not fired, but rather, suspended without pay pending investigation of his "insubordination."

53. Mr. Ferguson told Mr. Ricci that he felt that this suspension was in retaliation for reporting Mr. Vidal.

54.     On or around December 5, 2024, Mr. Ferguson informed HCSG Director Shawn Lucas ("Mr. Lucas") that Mr. Vidal had used a racial slur against him. Mr. Lucas responded that it could not be a racial slur because he had once used the term "moreno" in a rap record.

55.     On December 16, 2024, Plaintiff added Follow-Up Notes to his November 18, 2024, complaint describing the incidents in which Mr. Vidal referred to him as a "fuckin moreno" and the December 5, 2024 conversation with Mr. Lucas in which Mr. Lucas dismissed the use of the slur.

56.     No one contacted Mr. Ferguson until December 18, 2024, when he received a Termination Notice. This Termination Notice alleged that on December 3, 2024, Mr. Ferguson "engaged in insubordinate, unprofessional, hostile, and offensive behavior in the workplace."

57.     The Termination Notice paints Mr. Ferguson as aggressive and insubordinate. Mr. Ferguson reasonably understood that Defendants manufactured this purported behavior to justify his termination immediately following his complaints regarding OSHA violations, a hostile work environment and race-based discrimination.

58.     The termination of Plaintiff's employment resulted from decisions made or ratified by personnel acting within the scope of authority conferred by both HCSG and Epoch, including Regional Director Anthony Greco and HR representative Chris Ricci, whose authority extended to both the HCSG contractual relationship and the operational requirements of the Epoch Facility.

### FIRST CAUSE OF ACTION
*Race Discrimination in violation of Title VII of the Civil Rights Act of 1964 as against HCSG and Epoch Defendants*

59.     Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as though fully set forth at length herein.

60.     Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination in the workplace based upon an individual's race.

61.     Plaintiff was an employee within the meaning of Title VII §2000e(f), and Defendants were employers within the meaning of Title VII §2000e(b).

62.     Plaintiff is African American.

63.     Defendants subjected Plaintiff to unequal terms and conditions of employment based on his race, including being assigned more onerous work tasks and being subjected to unfair scrutiny and false accusations of insubordination. Mr. Vidal, Plaintiff's direct supervisor, was responsible both for assigning Plaintiff the extra work tasks and was overheard referring to him with a racial slur as a "fuckin moreno", leaving the racially discriminatory motivation for the assignments clear.

64.     Defendants ultimately terminated Plaintiff's employment on or about December 18, 2024, because of his race.

65.     Defendants' actions were wanton and in willful disregard of Plaintiff's rights under the law.

66.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

### SECOND CAUSE OF ACTION
*Hostile Work Environment Based on Race in Violation of Title VII of the Civil Rights Act of 1964 as against HCSG and Epoch Defendants*

67.     Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as though fully set forth at length herein.

68.     Title VII prohibits employers from discriminating against employees based on race, including by creating or permitting a hostile work environment.

11

69.     Plaintiff was an employee within the meaning of Title VII § 2000e(f), and Defendants were employers within the meaning of Title VII § 2000e(b).

70.     During Plaintiff's employment, Defendants, through Defendant Vidal and other employees, subjected Plaintiff to unwelcome conduct based on his race, including verbal abuse, threats, intimidation, and the use of racial slurs by Defendant Vidal. Defendant Vidal called Plaintiff a "fuckin moreno" and yelled that "you will do whatever I tell you to do", "I told you to clean the fuckin windows" and "I don't give a fuck about the trash, I told you to do the fuckin windows, I'm tired of you."

71.     The conduct created a hostile work environment that unreasonably interfered with Plaintiff's work performance.

72.     Defendants knew or should have known of the hostile work environment and failed to take prompt and effective remedial action.

73.     Defendant's actions were wanton and in willful disregard of Plaintiff's rights under the law.

74.     As a direct and proximate result of Defendants' aforementioned conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## THIRD CAUSE OF ACTION
*Retaliation in Violation of Title VII of the Civil Rights Act of 1964 as against HCSG and Epoch Defendants*

75.     Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as though fully set forth at length herein.

76.     Plaintiff was an employee within the meaning of Title VII §2000e(f), and Defendants were employers within the meaning of Title VII §2000e(b).

12

77. Pursuant to Title VII §2000e-3(a), it is unlawful for an employer to discriminate against any of its employees because "he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing."

78. Plaintiff engaged in protected activity by complaining about disability and race-based discrimination and a hostile work environment on November 18, 2024, December 5, 2024 and December 16, 2024.

79. In the days after Plaintiff submitted his complaint, Defendants subjected Plaintiff to materially adverse employment actions, including the alteration of his work schedule and duties, verbal abuse, and finally suspension on December 4 and termination on December 18, 2024. The temporal proximity between Plaintiff's submission of his complaint and the series of adverse employment actions taken against him clearly demonstrates an unlawful retaliatory motive for Plaintiff's termination.

80. Plaintiff's protected activity was a motivating factor in Defendants' decision to subject him to these adverse actions.

81. But for Plaintiff's engagement in protected activity, Plaintiff would not have been subjected to discrimination in the terms, conditions or privileges of his employment.

82. Defendants' actions were intentional, willful, malicious, and taken in reckless disregard of Plaintiff's rights under Title VII.

83. By engaging in the aforesaid acts, Defendants committed unlawful retaliation as defined by Title VII.

84.     As a direct and proximate result of Defendants' aforementioned conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**FOURTH CAUSE OF ACTION**
*Race Discrimination in Violation of the New York State Human Rights Law as against all Defendants*

85.     Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as though fully set forth at length herein.

86.     The New York State Human Rights Law § 296.1, codified as N.Y. Executive Law, Article 15 ("NYSHRL") prohibits employment discrimination on the basis of race.

87.     Plaintiff was an employee within the meaning of the NYSHRL, and Defendants were employers within the meaning of the NYSHRL.

88.     Defendants subjected Plaintiff to unequal terms and conditions of employment based on his race, including being assigned more onerous work tasks and being subjected to unfair scrutiny and false accusations of insubordination. Mr. Vidal, Plaintiff's direct supervisor, was responsible both for assigning Plaintiff the extra work tasks and was overheard referring to him with a racial slur as a "fuckin moreno", leaving the racially discriminatory motivation for the assignments clear.

89.     Defendants ultimately terminated Plaintiff's employment on or about December 18, 2024, because of his race.

90.     Individual Defendant Vidal directly participated in, aided, abetted, or otherwise facilitated the discriminatory conduct against Plaintiff in violation of N.Y. Exec. Law § 296(6).

91.     Defendants' actions were wanton and in willful disregard of Plaintiff's rights under the law.

14

92.     As a direct and proximate result of Defendants' aforementioned conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**FIFTH CAUSE OF ACTION**
*Hostile Work Environment Based on Race in Violation of the New York State Human Rights Law as against All Defendants*

93.     Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as though fully set forth at length herein.

94.     NYSHRL prohibits discrimination based on race, including creating or permitting a hostile work environment.

95.     Plaintiff was an employee within the meaning of the NYSHRL, and Defendants were employers within the meaning of the NYSHRL.

96.     During Plaintiff's employment, Defendants, through Defendant Vidal and other employees, subjected Plaintiff to unwelcome conduct based on his race, including verbal abuse, threats, intimidation, and the use of racial slurs by Defendant Vidal. Defendant Vidal called Plaintiff a "fuckin moreno" and yelled that "you will do whatever I tell you to do", "I told you to clean the fuckin windows" and "I don't give a fuck about the trash, I told you to do the fuckin windows, I'm tired of you."

97.     The conduct created a hostile work environment that unreasonably interfered with Plaintiff's work performance.

98.     Defendants knew or should have known of the hostile work environment and failed to take prompt and effective remedial action.

99.     Defendants' actions were wanton and in willful disregard of Plaintiff's rights under the law.

15

100.    As a direct and proximate result of Defendants' aforementioned conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## SIXTH CAUSE OF ACTION
*Retaliation in Violation of the New York State Human Rights Law as against all Defendants*

101.    Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as though fully set forth at length herein.

102.    NYSHRL prohibits retaliation against any employee for opposing discriminatory practices or for participating in any proceeding related to unlawful employment practices.

103.    Plaintiff was an employee within the meaning of the NYSHRL, and Defendants were employers within the meaning of the NYSHRL.

104.    Plaintiff engaged in protected activity by complaining about disability and race-based discrimination and a hostile work environment on November 18, 2024, December 5, 2024 and December 16, 2024.

105.    Following Plaintiff's protected activity, Defendants subjected him to materially adverse employment actions, including but not limited to altering his work hours and duties, verbal abuse, suspension without pay, and termination.

106.    The adverse actions taken against Plaintiff were motivated, at least in part, by his engagement in protected activity.

107.    Individual Defendant Vidal directly participated in, aided, abetted, or otherwise facilitated the retaliatory conduct in violation of N.Y. Exec. Law §296(6)

108.    The basis or motivating factor for these adverse acts was Plaintiff's protected activity.

16

109. But for Plaintiff's protected activity, Plaintiff would not have been subjected to retaliation and discrimination.

110. Defendants' conduct was intentional, willful, malicious, and undertaken in reckless disregard of Plaintiff's rights under the NYSHRL.

111. As a direct and proximate result of Defendants' aforementioned conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**SEVENTH CAUSE OF ACTION**
*Disability Discrimination in Violation of the Americans with Disabilities Act, codified as 42 U.S.C. §12112 against HCSG and Epoch Defendants*

112. Plaintiff hereby repeats and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth and contained herein.

113. Pursuant to the Americans with Disabilities Act ("ADA"), codified as 42 U.S.C. §12112 it is unlawful for an employer, because of an individual's disability, to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

114. Plaintiff was diagnosed with back spasm and lower back pain at the White Plains Hospital Emergency Room and instructed to avoid lifting and strenuous activity.

115. Plaintiff was subsequently diagnosed with a slipped disc, which has caused a substantial impairment of his major life activities and has required medical treatment.

116. Plaintiff suffers from a disability within the meaning of the ADA.

117. Defendants also perceived Mr. Ferguson to be disabled as defined by the ADA.

118. Plaintiff was an employee within the meaning of the ADA 42 U.S.C. §12112.

119. Defendants are employers within the meaning of the ADA 42 U.S.C. §12112.

120. Defendants engaged in an unlawful discriminatory practice when they changed Mr. Ferguson's job duties, cursed and yelled at Mr. Ferguson and terminated his employment on the basis of his disability, immediately after his return to work after his injury.

121. Plaintiff's similarly situated non-disabled co workers were not subjected to any of the above actions by the Defendants.

122. Mr. Vidal changed the terms of Mr. Ferguson's employment as soon as he returned to work following his injury. He adjusted his hours to be from 6:00 a.m. to 2:00 p.m. to 7:00 a.m. to 3:00 p.m. This directly hindered Mr. Ferguson's ability to complete his work as he now could not finish cleaning the carpets before the residents woke up for breakfast at 7:00 a.m. Additionally, Mr. Vidal screamed at Mr. Ferguson for questioning the change in his duties. When Mr. Ferguson stated that he would finish taking out the trash and then move to cleaning the windows, Mr. Vidal yelled "I don't give a fuck about the trash, I told you to do the fuckin windows, I'm tired of you." The discrimination of Mr. Ferguson culminated in his termination citing false allegations that Mr. Ferguson "engaged in insubordinate, unprofessional, hostile, and offensive behavior in the workplace." Based on the foregoing, it is clear that Mr. Ferguson was subjected to discrimination based on his disability.

123. Defendants' actions were wanton and in willful disregard of Plaintiff's rights under the law.

124. As a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under the law.

**EIGHTH CAUSE OF ACTION**
*Disability Discrimination in Violation of the New York State Human Rights Law against all Defendants*

125.    Plaintiff hereby repeats and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth and contained herein.

126.    Pursuant to NYSHRL, N.Y. Exec Law § 296, it is unlawful for an employer because of an individual's disability to "discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."

127.    Plaintiff was an employee within the meaning of New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 292(6).

128.    Plaintiff was diagnosed with back spasm and lower back pain at the White Plains Hospital Emergency Room and instructed to avoid lifting and strenuous activity.

129.    Plaintiff suffers from a disability within the meaning of the NYSHRL.

130.    Plaintiff was subsequently diagnosed with a slipped disc, which has caused a substantial impairment of his major life activities and has required medical treatment.

131.    Defendants also perceived Mr. Ferguson to be disabled within the meaning of the NYSHRL.

132.    Defendants were employers within the meaning of NYSHRL, N.Y. Exec. Law § 292(5).

133.    Defendants engaged in an unlawful discriminatory practice when they changed Mr. Ferguson's job duties, cursed and yelled at Mr. Ferguson and terminated his employment on the basis of his disability, immediately after his return to work after his injury.

134.    Plaintiff's similarly situated non-disabled co workers were not subjected to any of the above actions by the Defendants.

135. Mr. Vidal changed the terms of Mr. Ferguson's employment as soon as he returned to work following his injury. He adjusted his hours to be from 6:00 a.m. to 2:00 p.m. to 7:00 a.m. to 3:00 p.m. This directly hindered Mr. Ferguson's ability to complete his work as he now could not finish cleaning the carpets before the residents woke up for breakfast at 7:00 a.m. Additionally, Mr. Vidal screamed at Mr. Ferguson for questioning the change in his duties. When Mr. Ferguson stated that he would finish taking out the trash and then move to cleaning the windows, Mr. Vidal yelled "I don't give a fuck about the trash, I told you to do the fuckin windows, I'm tired of you." The discrimination of Mr. Ferguson culminated in his termination citing false allegations that Mr. Ferguson "engaged in insubordinate, unprofessional, hostile, and offensive behavior in the workplace." Based on the foregoing, it is clear that Mr. Ferguson was subjected to discrimination based on his disability.

136. Defendants' actions were wanton and in willful disregard of Plaintiff's rights under the law.

137. As a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under the law.

**<u>NINTH CAUSE OF ACTION</u>**
*Retaliation in Violation of the New York State Workers Compensation Law as against Defendants HCSG and Epoch*

138. Plaintiff repeats and re-alleges each and every allegation contained above with the same force and effect as though fully set forth at length herein.

139. Pursuant to New York Workers' Compensation Law § 120, it is unlawful for an employer to discriminate against any of its employees because "he has claimed or attempted to claim compensation from such employer, requested a claim form for injuries received in the course of employment, or claimed or attempted to claim any benefits provided under this chapter…."

140. Plaintiff's claim under New York Workers' Compensation Law § 120 is part and parcel to his disability discrimination, hostile work environment and retaliation claims under the ADA and NYSHRL. All concern the same discrimination, harassment and retaliation arising from Plaintiff's disability and protected activity related to his exercising his rights related to that disability.

141. Plaintiff engaged in protected activity by filing a workers' compensation claim after his injury on or around October 28, 2024.

142. Following Plaintiff's protected activity, Defendants HCSG and Epoch subjected him to materially adverse employment actions, including but not limited to altering his work hours and duties, verbal abuse, suspension without pay, and termination.

143. The adverse actions taken against Plaintiff were motivated, at least in part, by his engagement in protected activity.

144. The basis or motivating factor for these adverse acts was Plaintiff's protected activity.

145. But for Plaintiff's protected activity, Plaintiff would not have been subjected to retaliation and discrimination.

146. Defendants' conduct was intentional, willful, malicious, and undertaken in reckless disregard of Plaintiff's rights under the New York State Workers' Compensation Law §120.

147. As a direct and proximate result of Defendants' aforementioned conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants for all compensatory, emotional, psychological and punitive damages, lost compensation, front pay, back

pay, liquidated damage, injunctive relief, and any other damages permitted by law pursuant to the above-referenced causes of action. It is respectfully requested that the Court grant the Plaintiff any other relief to which he is entitled, including but not limited to:

A.    Awarding reasonable attorney's fees and the costs and disbursements of this action.

B.    Such other and further relief that the Court deems just and proper.

**Further,** Plaintiff demands a trial by jury.

Dated: Syosset, New York
        March 18, 2026

Respectfully,

**BELL LAW GROUP, PLLC**

*Paul A. Bartels*

_____

Paul A. Bartels, Esq.
*Attorneys for Plaintiff*
116 Jackson Avenue
Syosset, New York 11791
(516) 280-3008
paul@belllg.com